UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
OCALA DIVISION

ITI HOLDINGS, INC., d/b/a Technical Diving
International, SCUBA DIVING
INTERNATIONAL, EMERGENCY RESPONSE
DIVING INTERNATIONAL,

       Plaintiff,

v.                 Case No.  5:06-cv-85-Oc-10GRJ

PROFESSIONAL SCUBA ASSOCIATION
INTERNATIONAL, LLC, HAL WATTS, JANICE
WATTS,

       Defendants.
_____/

**REPORT AND RECOMMENDATION**[1]

Pending before the Court is Plaintiff's Motion for Attachment. (Doc. 44.) Defendant has filed a memorandum in opposition (Doc. 46.) and this matter is therefore ripe for review. For the reasons discussed below, Plaintiff's Motion for Attachment is due to be **DENIED**.

**I. BACKGROUND AND FACTS**

This case concerns claims for tortious interference with business relationships, misappropriation of trade secrets, civil conspiracy, copyright infringement, trademark infringement and unfair competition brought by Plaintiff ITI, a scuba diving training agency that develops standards and course material for advanced level scuba diving

---

[1] Specific written objections may be filed in accordance with 28 U.S.C. § 636, and Rule 6.02, Local Rules, M.D. Fla., within ten (10) days after service of this report and recommendation. Failure to file timely objections shall bar the party from a *de novo* determination by a district judge and from attacking factual findings on appeal.

instruction and certification, against Professional Scuba Association ("PSA"), a specialized dive training agency, and its founder Hal Watts, his wife Janice Watts, and a related limited liability company known as Professional Scuba Association, International, LLC. ("PSAI".)

Defendant PSA is a scuba diving training agency that competes with ITI in the market for providing scuba diving instruction and certification. Plaintiff alleges that Defendant PSAI is a subsidiary of PSA that was established to expand PSA's market presence in the national and international markets for advanced level scuba diving instruction and certification. Defendant Hal Watts is the founder and Chief Executive Officer of PSA and the Managing Member and/or Chief Executive Officer of PSAI. Plaintiff alleges that Defendant Janice Watts is the wife of Hal Watts and an employee and officer of Defendants PSA and PSAI.[2] Plaintiff also alleges that PSA "has always been a small, regional, specialized dive training agency..." and that "virtually all of its history centers on its founder, defendant Hal Watts, his diving interests, and his privately owned dive site, a sink hole known as "Forty Fathom Grotto."[3]

Plaintiff alleges that PSA, through the assistance of several employees, illegally took "ITI's corporate management, course materials, textbooks, photographs, internal memoranda, logos, customer lists, mailing lists and other proprietary material."[4] Plaintiff alleges that starting in September 2004, Defendants Hal and Jan Watts "developed and implemented a conspiracy to loot ITI of its corporate management, proprietary

---

[2] Defendants deny that Janice Watts is an employee or officer of PSA or PSAI. Doc. 33.

[3] Doc. 1, ¶ 19.

[4] Doc. 1, ¶. 28.

information and materials, its instructor base and its international distribution network."[5] Plaintiff alleges that the goal for this "conspiracy" is an attempt by Defendants to "reinvent PSA as ITI by illegally taking substantially all of its corporate assets, and to harm ITI by interfering with its ability to replace these assets and to provide current and future training materials and certifications."[6]

On January 19, 2007, Plaintiff filed the instant Motion for Attachment alleging that Defendant Hal Watts fraudulently transferred his interest in the Forty Fathom Grotto (the "Grotto") and thereby violated the Florida Uniform Fraudulent Transfer Act. Notably, while Plaintiff has filed nine exhibits in support of its motion for attachment - consisting of copies of memos, letters, corporate filings and other documents - the Plaintiff has not filed any affidavits or sworn evidence in support of its request for attachment. Defendants, on the other hand, have filed two sworn declarations, with exhibits, in opposition to the request for attachment.

Plaintiff represents in its unverified filing that it "began hearing rumors that the defendants were attempting to sell or lease their primary asset, the Forty Fathom Grotto."[7] Then in December, 2006, "ITI discovered a listing for the sale of a dive facility in central Florida...with amenities that are only available at the Forty Fathom Grotto."[8] Plaintiff alleges that on January 9, 2007, ITI "learned the defendants had already transferred the Forty Fathom Grotto" to Commercial Diving Academy, "effective January

---

[5] Doc. 1, ¶. 29.

[6] Doc. 44.

[7] Id.

[8] Id.

1, 2007." Plaintiff contends that defendants' transfer of Forty Fathom Grotto violates several "badges of fraud" under Florida's Uniform Fraudulent Transfer Act" because "defendants likely have been rendered insolvent by this transaction" and "will be left with insufficient assets to pay a judgment to ITI because they will have disposed of substantially all of their assets..."[9] Consequently, Plaintiff requests that the Court enter an Order "attaching the defendants' assets and/or proceeds from the sale and/or lease of the property known as 'Forty Fathom Grotto.'"[10]

## II. DISCUSSION

### A. Plaintiff has Failed to Comply with the Procedural Requirements Of Florida Law For Attachment

In an action pending in federal court motions for prejudgment attachment are governed by Rule 64 of the Federal Rules of Civil Procedure. Rule 64 provides in relevant part that "[a]ll remedies providing for seizure of ... property for the purpose of securing satisfaction of the judgment ultimately to be entered in the action are available under the circumstances and in the manner provided by the law of the state in which the district court is held ... " As such, Plaintiff's motion for attachment must comply with the statutory procedures for obtaining a prejudgment attachment under Florida law.

Chapter 76 of the Florida Statutes sets forth the requirements for a motion for attachment. Pursuant to Florida Statute 76.08, "a writ of attachment may issue when the

---

[9] Id.

[10] Id.

grounds relied on for the issuance of the writ clearly appear from specific facts shown by a verified complaint or a separate affidavit of the plaintiff...".[11]

When the debt is not due, the motion "shall state the amount of the debt or demand; that it is actually an existing debt; and the existence of one or more of the special grounds in s. 76.05, stating specifically the grounds and plaintiff shall produce before the officer granting the attachment satisfactory proof, by affidavit (other than his or her own) or otherwise, of the existence of the special ground."[12] The "special grounds" for a writ of attachment exist when the debtor: (1) is actually removing the property out of the state; (2) is fraudulently disposing of the property to avoid the payment of his or her debts; or (3) is fraudulent secreting the property to avoid payment of his or her debts."[13]

As a threshold matter, Plaintiff has failed to comply with these procedural requirements of Chapter 76 for obtaining a writ of attachment. First, although Plaintiff has alleged the "special ground" that Defendants are fraudulently disposing of the property to avoid payment of debt, Plaintiff has failed to establish by a verified complaint or sworn affidavit as to the existence of this "special ground." Plaintiff also has failed to state the amount of the debt and that there is actually an existing debt, in compliance with Florida Statute § 76.05.

Accordingly, in the complete absence of a verified complaint or satisfactory proof by way of affidavit, Plaintiff has failed to comply with the statutory requirements under

---

[11] Fla. Stat. § 76.08. (2006).

[12] Fla. Stat. § 76.10. (2006).

[13] Fla. Stat. § 76.05. (2006).

Florida law for obtaining the issuance of a writ of attachment. In addition to Plaintiff's failure to satisfy these statutory requirements, the due process clause of the United States Constitution forbids the issuance of a prejudgment writ where, as here, the request is based upon plaintiff's unverified conclusory allegations that the plaintiff believes one of the statutory grounds for issuance of an attachment exists.[14] Accordingly, these shortcomings by themselves, are sufficient to support the denial of Plaintiff's request for a prejudgment attachment.

However, even assuming that Plaintiff had supported his motion with a verified complaint or affidavit, Plaintiff's request for attachment is still due to be denied on the merits because Plaintiff has failed to establish the existence of any badges of fraud, which would entitle it to relief under Florida's Fraudulent Transfer Act.

***B.  Plaintiff Has Failed To Demonstrate A Fraudulent Transfer of the Property.***

In order to establish a violation of Florida's Fraudulent Transfer Act (the "UFTA"), a party must demonstrate that a transfer was made: (1) with actual intent to hinder, delay or defraud any creditor of the debtor; or (2) without receiving a reasonably equivalent value in exchange for the transfer or obligation, and the debtor: (a) was engaged or about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction; or (b) intended to incur, or believed or reasonably should have believed that he or she would incur, debts beyond his or her ability to pay as they became due.[15]

---

[14] Frasher v. Fox Distributing of S.W. Florida, Inc., 813 So.2d 1017, 1019 (Fla. Dist. Ct. App. 2002).

[15] Fla. Stat. § 726.106. (2006).

Plaintiff is proceeding only under the "actual fraud" provision of UFTA and not the constructive fraud provision. In determining "actual intent," consideration may be given, among other factors, to a number of factors known as badges of fraud.[16] These include consideration of whether: (1) the transfer or obligation was to an insider; (2) the debtor retained possession or control of the property transferred after the transfer; (3) the transfer or obligation was disclosed or concealed; (4) before the transfer was made or obligation was incurred, the debtor had been sued or threatened with suit; (5) the transfer was of substantially all of the debtor's assets; (6) the debtor absconded; (7) the value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred; (8) the debtor was insolvent or became insolvent shortly after the transfer was made or the obligation was incurred; (9) the transfer occurred shortly before or shortly after a substantial debt was incurred; or (10) the debtor transferred the essential assets of the business to a lienor who transferred the assets to an insider of the debtor.[17]

The standard under Florida law for determining whether a transfer is fraudulent is the preponderance of the evidence standard, with the burden resting on the plaintiff.[18] Further, while the mere presence of a single badge of fraud will not generally support a finding that a conveyance was made with actual intent to defraud, the presence of as

---

[16] *See,* Gass v. Comreal Miami, Inc., 653 So.2d 1069, 1070 (Fla. Dist. Ct. App. 1995).

[17] Fla. Stat. § 726.105. (2006).

[18] In re Stewart, 280 B.R. 268, 281 (M.D. Fla. 2001).

few as three badges of fraud may create a rebuttable presumption of fraudulent intent.[19] The bottom line, however, is that the determination must be made based upon the totality of the testimonial and documentary evidence.[20]

Plaintiff argues that Defendants have violated "six of the 'badges of fraud.'" Specifically, that: (1) Defendants have retained possession or control of the property transferred after the transfer through the lease with CDA; (2) the transfer was not disclosed to ITI and the "defendants' obligation to ITI may have been concealed from CDA; (3) before the transfer was made or obligation was incurred, the debtor had been sued; (4) the transfer was of substantially all of the debtor's assets; (5) the debtor was insolvent or became insolvent shortly after the transfer was made or the obligation was incurred; and (6) the transfer occurred shortly before a substantial debt was incurred. The Court will address each of these alleged "badges of fraud" in turn.

### 1. Defendant Did Not Retain Possession or Control of the Grotto.

Plaintiff argues that Defendants have retained possession or control of the Grotto because the Grotto was leased to CDA. However, Defendants have attached a Declaration of Hal Watts, in which Mr. Watts affirms that he leased the Grotto to CDA on January 1, 2007 and that the possession and control of the Grotto will rest with CDA during the period of the lease, subject to various lease provisions.[21] There has been no

---

[19] Myers v. Brook, 708 So.2d 607, 610 (Fla. Dist. Ct. App. 1998)(one badge insufficient); Advest v. Rader, 743 F.Supp. 851, 854 (S.D. Fla. 1990)("Absence of proportionate consideration, family relationship between the transferor and transferee, and retention of possession of the property by the transferor" may be sufficient badges of fraud.)

[20] In re Old Naples Securities, Inc., 343 B.R. 310, 319 (M.D. Fla. 2006).

[21] Doc. 46-4, Watts Declaration.

suggestion by Plaintiff that CDA is an insider of any of the Defendants through which Mr. Watts would be able to retain control or possession of the Grotto. There also has been no allegation by Plaintiff that Mr. Watts has not and is not receiving fair consideration for the lease of the Grotto. The affidavit of Hal Watts confirms that he was originally offered $2,500 per month for the Grotto but eventually secured a payment of $3,500 per month for 2007, "with monthly payments for the following years adjusted in accordance with the consumer price index increase from each previous year."[22]

Accordingly, because Plaintiff has failed to offer any evidence demonstrating that Hal Watts has retained possession or control of the operation of the Grotto or that the lease with CDA was not for fair value, Plaintiff cannot satisfy this badge of fraud.

### *2. The Transfer of Forty Fathom Grotto Was Not Concealed.*

Plaintiff alleges that the transfer of the Grotto was not disclosed to ITI or the Court and that the Defendants' obligations to ITI may have been concealed from CDA. However, Defendants contend that "Hal Watts did not actively conceal his efforts to lease the Grotto given that he hired a broker to publicly list that property for lease and the dive shop for sale."[23] In addition, Defendants have attached a declaration of Jan Watts in which she avers that "she discussed the lease of the Grotto with ITI

---

[22] Id.

[23] Id.

representatives in 2004."[24] Thus, Defendants suggest that the lease of the Grotto "was actively disclosed to Plaintiff."[25]

The listing for the lease of the Grotto was subject to an "Exclusive Right of Sale" Listing Agreement with Murphy Business & Financial Services, Inc[26] and it is, therefore, evident that Hal Watt's effort to transfer the Grotto was publicly disclosed through a listing and was not concealed, as suggested by Plaintiff. As such, Plaintiff has failed to establish that the transfer was concealed or was carried out in secret so that the public would not know of the transfer.

### *3. The Lease of the Grotto Was Not In Response to the Instant Case.*

Plaintiff alleges that because the Defendants were sued before the transfer was made this fact evidences an intent to defraud. Defendants respond by stating that while the Grotto was indeed leased after the filing of the instant lawsuit, "it is indisputable that Hal Watts had begun negotiations with various individuals regarding the lease of the Grotto and sale of the dive shop inventory/compressors months before the alleged actions underlying this dispute occurred... and nearly two years prior to the filing of this lawsuit."[27]

Mr. Watts states under penalty of perjury in his declaration that beginning in 2004, he "engaged in discussions with various individuals regarding the lease of the Forty Fathom Grotto." Furthermore, in the summer of 2004, Mr. Watts avers he

---

[24] Doc. 46-3.

[25] Doc. 46.

[26] Watts Declaration, ¶ 20; *See also,* Doc. 46, Ex. "5."

[27] Doc. 46.

engaged in negotiations with Martin Schutzbank regarding this lease and as further evidence he has attached as exhibits to his affidavit correspondence and a copy of an informal confidentiality agreement concerning the negotiations with Schutzbank.[28]

Mr. Watts thereafter engaged in serious negotiations with Michael Stephens, M.D., regarding the lease of the Grotto. These negotiations continued through October 2004, at which time Dr. Stephens had received and analyzed financial records for the Grotto. Attached as Exhibit 4 to Defendants' response is a copy of a draft lease agreement between Mr. Watts and Dr. Stephens regarding an 18-month lease of the Grotto. The lease was to commence January 1, 2005, 10 months before ITI filed its lawsuit in Maine and 14 months before ITI filed its lawsuit in Florida.

Accordingly, based upon this sworn evidence - and in the absence of any sworn evidence refuting the fact that Hal Watts began his efforts to negotiate the lease of the Grotto long before this lawsuit was filed -  Plaintiff has failed to establish this badge of fraud.

### 4. *There is No Evidence that the Transfer of the Grotto Was a Transfer of Substantially All of Defendants' Assets.*

Plaintiff alleges that the transfer of the Grotto was a transfer of substantially all of the Defendants' assets. Again, other than conjecture, Plaintiff provides no support for these assertions. Further, as Defendants point out the Grotto is owned solely by Hal Watts and not by the other Defendants. Accordingly, with regard to whether the transfer constituted a transfer of all of the assets, only the assets of Hal Watts are relevant to the inquiry.

---

[28] Doc 46, Watts decl., Exs. "1" and "2".

As Defendants correctly point out, the fact that Hal Watts has retained ownership of the Grotto - and thus the Grotto continues to be an available asset that could be levied upon in execution of a judgment - undermines the premise of Plaintiff's argument that Hal Watts transferred substantially all of his assets. Indeed, there is "nothing in the lease with CDA that prohibits Mr. Watts from selling the Grotto (subject to the lease) or borrowing against it to pay an award."[29] Simply put the lease of the Grotto has not made, nor will it make, Hal Watts judgment proof if he loses this case.

Lastly, if there was any question as whether Watts had made himself judgment proof by leasing the Grotto that notion is put to rest in the Watts declaration in which Watts affirms that independently of the Grotto he retains assets sufficient to pay a damage award against him.[30]

Accordingly, as there is no evidentiary support for Plaintiff's claim that the lease of the Grotto was a transfer of all the Defendants' assets the Plaintiff has also failed to establish this badge of fraud.

### 5. *There is No Evidence That The Transfer of the Grotto Rendered Defendants Insolvent.*

Plaintiff alleges that the Defendants became insolvent shortly after the transfer of the Grotto. Again, Plaintiff fails to provide any support for this allegation.

In contrast, Defendants point out that the "the very existence of the lease agreement between Hal Watts and CDA, which provides Hal Watts with $3,500 per month in revenue for 2007, with monthly rent increasing with the CPI for the following

---

[29] Id.

[30] Watts Declaration, ¶ 33.

nine years, demonstrates that at least one Defendant maintains an income."[31] Accordingly, in view of the fact that Watts continues to own the Grotto and continues to receive lease payments from CDC, there is absolutely no basis to support Plaintiff's position that as a result of the transfer the "Defendants" have become insolvent.

### 6. *While the Actual Lease of the Grotto Was Executed A Few Months Before Trial, the Negotiations for a Lease of the Grotto Have Been Underway Since 2004.*

Plaintiff alleges that the transfer of the Grotto occurred shortly before a substantial debt was incurred again arguing that the lease took place last month, which was shortly before the trial in this case presently scheduled for May 2007. This argument by Plaintiff is simply a rehash of his argument in support of the third badge of fraud and is equally unavailing.

While there is no dispute that the lease was entered into by Hal Watts only months before trial, that fact standing in isolation is not determinative of fraudulent intent. Rather, the logical inference to be drawn from this badge of fraud is that a party transferred an asset because of an impending judgment. However, as discussed above, Hal Watts was negotiating the lease of the Grotto since at least 2004. The lease of the Grotto was not an event that was engineered on the eve of trial to avoid paying a possible judgment. If that is what Hal Watts intended to do he could have simply sold the Grotto and then concealed the proceeds from the sale.

In sum, other than the mere timing of the lease, Plaintiff has provided absolutely no support for any of the alleged badges of fraud. In contrast, the Defendants have

---

[31] Doc. 46.

provided sworn declarations refuting each and every argument offered by Plaintiff. For these reasons, the Plaintiff has failed to establish any grounds sufficient to support the issuance of a prejudgment attachment of "Defendants' assets and/or proceeds from the sale and/or lease of the Forty Fathom Grotto."

**C.     Plaintiff Is Not Entitled To Preliminary Relief Under The Court's Inherent Powers**

Alternatively, Plaintiff has requested that the Court invoke its inherent equitable powers to order preliminary relief, including an asset freeze, to assure the availability of permanent injunctive relief under its Lanham Act claims. Plaintiff's request for preliminary relief is due to be denied for several fundamental reasons.

First, to the extent that the Plaintiff is requesting the entry of a preliminary injunction, the Plaintiff has failed to satisfy the necessary elements for issuance of a preliminary injunction under Rule 65 of the Federal Rules of Civil Procedure and has failed to satisfy the requirements of Rule 4.06 of the Local Rules for the Middle District of Florida, which *inter alia* require that a motion for preliminary injunction be supported by allegations of specific facts shown in a verified complaint or accompanying affidavits. As discussed above, Plaintiff has not offered any affidavits or other sworn proof in support of its motion.

Secondly, even if the Plaintiff had complied with Local Rule 4.06, the Plaintiff is not entitled to preliminary injunctive relief to freeze assets so that it may satisfy a judgment if successful.[32]  Thus, the appropriate avenue in federal court for pursuing

---

[32] *See,* Mitsubishi International Corporation v. Cardinal Textile Sales, Inc., 14 F.3d 1507, 1521 (11th Cir. 1994)("Ordinarily, '[t]he general federal rule of equity is that a court may not reach a defendant's assets unrelated to the underlying litigation and freeze them so that they may be preserved to satisfy a

(continued...)

14

prejudgment remedies is through available state remedies as authorized by Rule 64 of the Federal Rules of Civil Procedure, and not, as Plaintiff has attempted to do so, by requesting the entry of a preliminary injunction.[33]

Lastly, to the extent that a court does have inherent equitable powers to order preliminary injunctive relief to assure that permanent injunctive relief will be available[34] the plaintiff is still required to establish all of the requisites for the issuance of a preliminary injunction.[35] Plaintiff has failed to satisfy any of these prerequisites and indeed the competent evidence before the Court establishes that there is no substantial threat of irreparable injury to Plaintiff if an injunction is not granted. Rather, the legal ownership of the Grotto continues to remain in the name of Hal Watts and is therefore an available asset that Plaintiff could levy upon if it obtained a final judgment in this case. And if Plaintiff did not wish to levy on the Grotto if it obtained a judgment, Plaintiff also has the option of garnishing the lease payments owed to Watts by CDC. For this reason the Plaintiff has failed to satisfy even the threshold showing of irreparable injury to establish a right to preliminary injunctive relief.

---

[32](...continued)
potential money judgment.'")

[33] *Id.* At 1521-22 ("We conclude that Rule 64, and not Rule 65 (which governs injunctions generally), provided the standard for evaluating a request for preliminary injunctive relief that is, in realty, no more than a request for prejudgment attachment.")

[34] *See,* Levi Strauss & Co. V. Sunrise International Trading Co., 51 F.3d 982, 987 (11th Cir. 1995)("[w]e conclude that the district court had the authority to freeze those assets which could have been used to satisfy an equitable award of profits.")

[35] The prerequisites for preliminary injunctive relief are: (1) a substantial likelihood of success on the merits, (2) a substantial threat of irreparable injury if the injunction were not granted, (3) that the threatened injury to the plaintiffs outweighs the harm an injunction may cause the defendant, and (4) that granting the injunction would not disserve the public interest. Levi Strauss & Co., 51 F.3d at 985(*citing* Church v. City of Huntsville, 30 F.3d 1332, 1342 (11th Cir. 1994)).

## **RECOMMENDATION**

In view of the foregoing, it is respectfully **RECOMMENDED** that Plaintiff's Motion for Attachment (Doc. 44) be **DENIED.**

**IN CHAMBERS** in Ocala, Florida, on February 27, 2007.

GARY R. JONES
United States Magistrate Judge

Copies to:

    The Honorable Wm. Terrell Hodges
    Senior United States District Judge

    Counsel of Record